| | |
|---|---|
| DISTRICT COURT<br>BOULDER COUNTY, COLORADO<br><br>1777 6th Street, Boulder, CO  80306<br>_____<br><br>Plaintiff:<br><br>BRIGHTSPOT SOLUTIONS, LLC<br><br>vs.<br><br>Defendants:<br><br>A+ PRODUCTS, INC.<br>_____<br><br>*Attorneys for Plaintiff:*<br><br>Ian T. Hicks, Reg. No. 39332<br>The Law Office of Ian T. Hicks LLC<br>6000 East Evans Avenue, Building 1, Suite 140<br>Denver, Colorado, 80222<br>Telephone: (720) 216-1511<br>Facsimile: (303) 648-4169<br>E-mail: ian@ithlaw.com | DATE FILED: September 22, 2020 5:47 PM<br>FILING ID: 345AEAF6F4F42<br>CASE NUMBER: 2020CV30787<br><br><br>▲ COURT USE ONLY ▲<br>_____<br><br>Case Number:<br><br>Division: |
| **PLAINTIFF'S COMPLAINT** ||

Plaintiff, BrightSpot Solutions, LLC, ("Plaintiff" or " BrightSpot") by and through its undersigned counsel of record, The Law Office of Ian T. Hicks, LLC, hereby respectfully files its Complaint, and in support thereof, states as follows:

EXHIBIT A

### I.  PARTIES, JURISDICTION, AND VENUE

1. BrightSpot Solutions, LLC, ("BrightSpot") is a limited-liability company organized and existing under the laws of the state of Colorado. BrightSpot's principal office is located at 11715 Vermillion Road, in Longmont, Colorado, 80504.

2. A+ Products, Inc., ("A+") is a corporation organized and existing under the laws of the state of New York. A+'s principal office is located at 8 Timber Lane, in Marlboro, New Jersey, 07746.

3. This Court territorial jurisdiction in the form of specific personal jurisdiction over the Defendant, under both Colorado's long-arm statute and the Due Process Clause of the Fourteenth Amendment, as incorporated against this state.

4. First, jurisdiction exists under C.R.S. § 13-1-124(1)(a), because it conducted business in this state, in the form of a long-running business relationship with the Plaintiff, while Plaintiff was located in Colorado, involving approximately 50 separate purchase orders , payments by Plaintiff from Colorado, and approximately 1000 or more communications between the parties concerning those transactions over a period of approximately 10 years.

5. Second, jurisdiction exists under C.R.S. § 13-1-124(1)(b), because the Defendant committed a tortious act within this state, by virtue of the purposefully-directed and intentionally wrongful acts and omissions alleged herein, which have caused and will continue to cause damages to Plaintiff while it is located in Colorado, a fact of which the Defendant is aware and was aware at the time of setting in motion the events alleged herein.

6. The exercise of such specific personal jurisdiction also does not violate the Due Process Clause, because the Defendant has sufficient, and indeed, numerous and significant, contacts with this state through its business relationship with the Plaintiff, involving hundreds of

thousands of dollars, dozens of payments, shipments, and transfers of monies from Colorado, and which occurred over a period of several years.  Further, the claims alleged herein arise out of and relate to those contacts, such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

7. Indeed, the parties' commercial relationship arose out of solicitation efforts by A+ to BrightSpot, which were purposefully directed at Colorado, and included an in-person meeting at the home of BrightSpot's owner and manager initiated by A+.  Furthermore, the owner and managing agent of A+, Michael Schreiber, made numerous trips to Colorado meeting with BrightSpot's owner and manager in connection with the parties' ongoing, long-term business relationship. Finally, A+ regularly exhibits at trade shows in Colorado.

8. Under C.R.C.P. 98(c), venue is proper in this Court because the Defendant is a nonresident of this state, Plaintiff is a resident of Boulder County, and the wrongful acts and omissions were committed in and had effects in Boulder County.

### III.    GENERAL ALLEGATIONS

9. BrightSpot is a small, closely-held Colorado limited liability company run by longtime resident Scott Salzman.  Its primary business is the development, sales, and marketing of new products.

10. This civil action concerns two products that were developed by BrightSpot, including the (1) Spotless Swing Premium Multi-Use Golf Towel (the "Spotless Swing") and (2) Spotless Paw Cleaning Glove ("Spotless Paw").

11. A+ is a New Jersey corporation, but has physical offices in located in the United States, Canada, and China.  Further, A+ has distribution centers on the east coast and in Utah.

12. A+ sells a broad array of products, focusing on metal and plastic hardware, fasteners, buckles, and trim pieces.

13. BrightSpot engaged A+, however, to obtain its services, which, as advertised on its publicly-accessible website, include sourcing, logistics, and third-party services.

14. That website is fully interactive, in that in solicits business and input from prospective customers in the same fields of business where BrightSpot operates, and seeks to initiate ongoing commercial relationships through an online contact form providing for two-way communication.

15. A+ advertises on its website that with respect to sourcing, it specializes in locating vendors in the Asia-Pacific region to "cover all aspects of the manufacturing process, from the smallest components to final retail-ready goods."

16. Thus, the services advertised by A+ cover each step in the chain necessary to facilitate the completion of a product, from the sourcing of materials, to manufacturing, packaging to logistics and delivery of the product from the Asia-Pacific region to the United States.

17. In order to hone its target demographic, A+ explains on its website that "[w]e help customers who have a new item they want to have manufactured overseas, but have no idea where to start.  Many businesses look at having their products manufactured in Asia because it can often result in substantial cost savings."

18. Just below that explanation, on its website A+ describes the scope and breadth of its sourcing service as follows:

4

Why Use A+?

By using A+ Group to source your items, customers save time and money by not having to travel overseas themselves to find the right manufacturer or maintain an office in the location where their products are being manufactured. They also enjoy the benefit of cost-savings from not having to hire legal contractors to deal with international accounting or shipping paperwork. A+ Group will handle all of that for you.

Our first step is to qualify a potential factory where your products might be manufactured, which includes visiting the factory first-hand. Once they have gone through that process, the factory has the ability to become part of our Preferred Vendor Program, which involves continually reviewing and grading their performance to ensure our customers always have access to the best possible vendors.[1]

19.     A+ further advertises on its website, with respect to logistics and fulfillment, that it can safely and effectively handle the process of getting the completed product to its customers, as follows:

LOGISTICS & FULFILLMENT
- MOVE, STORE, MANAGE -

So you have designed a product and had it manufactured in China – now what?

The logistics of getting your product to you is often as complicated as getting it made in the first place, especially if you are dealing with smaller quantities which often don't qualify for the volume discounts large companies benefit from. A+ Group can handle all of the logistics and take the worry away so you can focus on selling your products with a higher profit margin. Whether it be shipping the final product from Asia to the USA, or between factories in China where one component is being made in one factory and going to another for final assembly.

Move, store, manage. We take care of all aspects of your supply chain.

20.     A+, on its website, seeks to distinguish itself from its competitors by advertising that it has a physical office in Shanghai, China, thus indicating that it has the unique ability to

---

[1] http://www.aplusproducts.net/

ensure, through its physical presence, on the ground, the proper manufacturing and delivery of products from China:

### IMPORT / EXPORT / SHIPPING

From our fully staffed office in Shanghai, A+ will coordinate and manage the shipment of your products from the factory to your warehouse or between factories (whether in the USA or Asia), anywhere around the world. This includes the costly legal aspects and documentation.

21. To further amplify its abilities, A+ states as follows on its website, with respect to its marketing and sale of third-party services:

### THIRD-PARTY SERVICES
### WE WILL BE THERE WHEN YOU CAN'T

Are you a company who is already working with a vendor or factory in China but don't have staff there on the ground? A+ Group's third-party services can provide you with the eyes and ears on the ground you need without having to send your own people or hiring additional staff in China.

22. A+ further advertises that as part of its third-party services offerings, it will physically visit the manufacturer in China, to ensure directly that the manufacturer is not only willing, but also capable of production:

### VENDOR/FACTORY QUALIFICATIONS

A+ Group will go into a factory or vendor to do the initial qualifying review to ensure that it will be capable of producing the required item(s) to the quality standards you are entitled to.

This process usually entails ensuring a facility has the proper equipment, personnel, training, and manufacturing expertise you need to have your product produced to your standards.

### FACTORY INSPECTIONS & AUDITS

Committing to working with a factory in a foreign country can be a daunting experience. Once you have selected a factory to work with, it's wise to have the factory audited to ensure your relationship stays on track right from the beginning. A+ has trained auditors who can go on-site to make sure the factory meets your

> requirements for production capability and capacity before you do business with them.
>
> Once you begin working with a factory, A+ can go onsite for you as often as you require to inspect the overall facility to make sure everything is on the up-and-up, and maintain a good relationship for you with the vendor. We can also be there if you have an important order that you need someone on the ground to inspect before it goes out the factory doors.

23. These manifold representations demonstrate that A+, in providing the services alleged in paragraphs 15-22, undertakes to inspect, manage, and control the manufacturing of products in the Asia Pacific region, which are then delivered to its customers for sale in the United States.

24. Indeed, the business model for A+ is dependent upon its exclusive and predominating control over the entirety of those manufacturing processes, thus placing A+ in the position of a product manufacturer and seller.

25. In reliance upon these representations, and the parties' long-term course of dealing, BrightSpot contracted with A+ for the manufacture and delivery of the Spotless Swing and Spotless Paw.

26. More specifically, BrightSpot paid for sufficient material to have 11,300 Black Spotless Swing, 1,000 Red Spotless Swing, 1,000 Green Spotless Swing, and 2,400 Spotless Paw manufactured by A+, through its Chinese factory.

27. Rather than those amounts, A+ purported to manufacture only 3,126 Black Spotless Swing, 948 Red Spotless Swing, 1,026 Green Spotless Swing, and 1152 Spotless Paw.

28. However, 576 Spotless Paw, were entirely defective because their size did not meet BrightSpot's requirements and did not match the approved samples provided by A+.

29. Furthermore, A+ appears to have lost, wasted, or misused enough material to make 1248 Spotless Paw, resulting in a loss of approximately 1,824 Spotless Paw.

After the first 576 defective gloves, A+ did subsequently make another order of 576 Spotless Paw gloves which were correct but the material for the first 576 was wasted, as was the lost or wasted material for 1248 gloves, thus 1824 Spotless Paw were not made.

30.     With respect to Spotless Swing, A+ lost, wasted, or misused enough material to make 2,794 Spotless Swing.  Thus, BrightSpot lost out on the retail sale to its customers and potential customers of 1,824 Spotless Paw and 2,794 Spotless Swing.

31.     Moreover, despite the parties' long-term business relationship, and the promise by A+ to fulfill a subsequent order for the manufacture 3,700 Spotless Swing, based on fabric already purchased by BrightSpot, without any legal or rational justification, A+ has refused to fulfill the purchase order.

32.     Notably, this purchase order was affirmatively and expressly invited by an agent of A+, and then accepted when made by another agent of A+ with actual and apparent authority to accept the order on behalf of A+.  Indeed, this latter agent was the one who had accepted prior orders from BrightSpot over the course of their many years of conducting business.

33.     Upon information or belief, the agents of A+ expressly invited and accepted this latest purchase order to induce BrightSpot to agree resolve certain outstanding obligations owed by A+ to BrightSpot, even though A+ had no present intent to perform this obligation.

34.     BrightSpot's information or belief arises from the fact that the request to fulfill this latest purchase order occurred during the course of negotiations to resolve the outstanding obligations owed by A+ to BrightSpot, and those negotiations involved failures to perform or threats not to perform with respect to similar legal obligations.

35. BrightSpot's business has come, over a period of several years and numerous transactions with A+, to rely upon A+ to manufacture goods in the Asia-Pacific region and deliver them to BrightSpot in the United States.

36. BrightSpot made A+ aware that its nonperformance would likely cause its business to collapse, and despite this fact, it willfully and intentionally induced reliance by BrightSpot and then pulled the carpet out from beneath it, which is likely to harm its business irreparably.

37. Moreover, BrightSpot has suffered and will continue to suffer economic damages, loss of profits, loss of business goodwill, and harm to its reputation.

38. Instead, A+ has threatened, without basis or justification, to ship the material to BrightSpot in Colorado, for which it has no use without the assistance of A+ and the performance of its contract with BrightSpot.  Should 38 and 39 be swapped?

39. Even for the fabric that has not been used, BrightSpot has no alternative manufacturer, cannot locate any alternative manufacturer, and the cost and delay of doing so and shipping the materials back to the other side of the planet will eviscerate the economic benefit that it reasonably expected and that A+ was aware of when it acted in bad faith.

### IV.   CLAIMS FOR RELIEF

#### First Claim for Relief – Breach of Contract

40. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

41. BrightSpot and A+ had a contractual agreement, which involved an offer an acceptance, a reasonably definite subject matter, and was supported by legally-adequate consideration.

42. A+, however, failed to perform its contractual obligation to produce the Spotless Paw and Spotless Swing in a sufficient quantity and with sufficient workmanship for the amount of raw materials that were purchased by BrightSpot.

43. A+ also failed to perform its contractual obligation to produce goods in conformance with the final purchase order tendered by BrightSpot and accepted by A+, by refusing after acceptance to comply with its earlier promises.

44. These breaches were material and substantial, failed to give BrighSpot the benefit of its bargain, and were the legal and direct cause of BrightSpot's injuries, damages, and losses.

**Second Claim for Relief – Fraudulent Misrepresentation**

45. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

46. A+, through its actually and apparently-authorized agents, made a representation of material past or present fact, or of a future material fact or promise coupled with a present intent not to perform.

47. A+ made these representations with the intent to induce BrightSpot to rely, and BrightSpot did so reasonably rely to its detriment.

48. Further, A+ made these representations knowing they were false, or not knowing whether they were true or false, and with the knowledge that if BrightSpot knew the truth, it would have undertaken a different course of action.

49. The material misrepresentations of A+ as described herein constitute fraudulent misrepresentation, which proximately caused BrightSpot to suffer injuries, damages, and losses.

### Third Claim for Relief – Unjust Enrichment

50. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

51. By virtue of the acts and omissions alleged herein, A+ obtained a benefit and the expense of BrightSpot.

52. A+ obtained that benefit without paying for it.

53. Under the circumstances, it would be unjust for A+ to retain that benefit without paying BrightSpot for it.

54. The unjust enrichment of A+ caused BrightSpot to suffer injuries, damages, and losses in an amount to be proven at trial.

### V.     PRAYER FOR RELIEF

BrightSpot respectfully requests the Court enter judgment in its favor on every claim for relief, and aware the following additional relief:

1. Economic and non-economic damages;

2. Pre and post-judgment interest;

3. Attorneys' fees and provided by contract or statute;

4. Specific performance of the parties' contract; and

5. Such other and further equitable relief as it deems proper.


Dated September 22, 2020

Respectfully submitted,

THE LAW OFFICE OF IAN T. HICKS LLC


By         *s/ Ian T. Hicks*
         Ian T. Hicks
     *Original Signature on File at The Law Office of Ian T. Hicks, LLC*

Plaintiff's Address:

11715 Vermillion Rd.

Longmont, CO 80504